AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>2019 Hyundai Tucson, gray in color, bearing Ohio tags<br>JIY7917, VIN # KM8J2CA43KU943637 | )<br>)<br>)  Case No.  1:21-MJ-00857<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:       Any authorized law enforcement officer

        An application by a federal law enforcement officer or an attorney for the government requests the search and seizure
of the following person or property located in the _____Southern_____ District of _____Ohio_____
*(identify the person or describe the property to be searched and give its location)*:
  See Attachment A6 (incorporated by reference).

        I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
  See Attachment B (incorporated by reference).

        **YOU ARE COMMANDED** to execute this warrant on or before _____November 29, 2021_____ *(not to exceed 14 days)*
  ☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

        Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

        The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _Hon. Stephanie K. Bowman or Hon. Karen L. Litkovitz_ .
                                                                         *(United States Magistrate Judge)*

        ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
        ☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  ____**5:29 PM, Nov 15, 2021**____          *Stephanie K. Bowman*
                                                                         *Judge's signature*

City and state:   Cincinnati, Ohio_____          Stephanie K. Bowman, United States Magistrate Judge
                                                                         *Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>1:21-MJ-00857 | Date and time warrant executed:<br>11/16/2021  6:05AM | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

– Nothing taken during search of the vehicle.

(Vehicle was siezed as evidence and subsequently returned to the owner on 11/17/2021).

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 11/22/2021

_____
_Executing officer's signature_

Anthony C. Ott – SA FBI
_Printed name and title_

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>2019 Hyundai Tucson, gray in color, bearing Ohio tags<br>JIY7917, VIN # KM8J2CA43KU943637 | )<br>)<br>)  Case No. 1:21-MJ-00857<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A6 (incoporated by reference).

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code,<br>Section 846 | Conspiracy to Possess with Intent to Distribute and Distribute Controlled<br>Substances |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Anthony C. Ott, Special Agent FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____FaceTime video conference_____ *(specify reliable electronic means)*.

Date: __**Nov 15, 2021**__

*Judge's signature*

City and state:  Cincinnati, Ohio

Stephanie K. Bowman, United States Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR SEARCH WARRANTS**

I, Anthony C. Ott, being duly sworn hereby and state as follows:

**INTRODUCTION**

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) assigned to the Cincinnati, Ohio Field Office Division, and have been so employed since October 2000.  As a Special Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. The Attorney General of the United States has empowered me with Title 21 authority, which authorizes me to seize property, conduct search warrants, and make arrests of persons for violations of the Controlled Substances Act.

2.      I am currently assigned to investigate matters involving violent crimes, violent crimes against children, organized crime, criminal enterprises, and narcotics to include the unlawful possession, possession with intent to distribute, and actual distribution of controlled substances.  As a special agent, I have participated in the preparation and execution of federal arrest and search warrants related to numerous criminal offenses, including those involved in the current investigation.  I have also been involved with the analysis of pen registers, the monitoring of Title III wire intercepts, and the installation and monitoring of tracking devices for vehicles in relation to narcotics investigations. Further, I have been the affiant and obtained numerous Federal warrants for the cell phone data location of fugitives and subjects under investigation by the FBI.

3.      In my experiences I have had the opportunity to monitor, listen, and review transcripts pertaining to communications which involved the trafficking of illegal narcotics by persons who attempted to thwart law enforcement by speaking in some sort of coded language.

I have also participated in numerous post arrest and proffer interviews of individuals with knowledge of illegal drug trafficking that had been involved in using coded language and were familiar with day-to-day operations utilized by those involved in the illegal trafficking of narcotics. Through these interviews and other investigative experiences, I have gained knowledge regarding the various methods, techniques, codes, and/or jargon used by illegal drug traffickers in the course of conducting their criminal activities.

4.      In addition, I have utilized confidential informants, pen registers, toll records, physical surveillances, and electronic surveillances in the process of my investigations to further my knowledge regarding the operations of those involved in illegal narcotics distribution. I have further been the affiant on Federal search warrants, have testified in Grand Jury proceedings, and have written reports during the course of conducting investigations.

5.      Through my training, experiences, and communications with other experienced agents and officers who conduct drug investigations, I have become familiar with methods used by drug traffickers to import, transport, store, collect, and safeguard illegal narcotics. Additionally, my training and experiences have given me knowledge regarding the methods used by drug traffickers to communicate with each other, to launder drug proceeds, and to thwart efforts by law enforcement to detect their illegal activities. I also have gained intelligence through my experiences, and through conversations with others who have conducted drug-related investigations, in regard to methods by which drug traffickers package, prepare, and distribute narcotics.

6.      Facts set forth in this affidavit are based on personal knowledge derived from my participation in this investigation and upon information presented to me by other law enforcement officers involved in this case to include fellow agents of the DEA, Ohio Bureau

of Criminal Investigation, the Drug Abuse and Reduction Task Force (DART), Hamilton County Regional Enforcement Narcotics Unit (RENU), Cincinnati Police Department (CPD), Hamilton County Probation Office, Butler County Undercover Regional Narcotics Unit (BURN) and other law enforcement agencies.  The sources of my information and beliefs include: (1) oral and written reports about this and other investigations which I have received from fellow law enforcement agencies; (2) physical and electronic surveillance conducted by Special Agents of the FBI and/or other law enforcement authorities which have been reported to me either directly or indirectly; (3) interviews of subjects, witnesses, victims, and confidential sources; (3) search warrants of residences, vehicles, and cell phones; and (3) law enforcement controlled drug buys.

7.      Since this affidavit is being submitted for the limited purpose of establishing probable cause authorizing search and seizure, I have not included each and every fact and circumstance I am aware of.  I have set forth only those facts which I believe are necessary to establish such probable cause.

## PURPOSE OF THE AFFIDAVIT

8.      This affidavit is submitted in support of an application for search warrants for evidence, contraband, fruits, and instrumentalities of crime, persons to be arrested, property used or intended to be used in the commission of crime(s) and search and seizure of digital devices located at the subject premises and surrounding curtilage, related to evidence of a conspiracy to possess with intent to distribute and distribute heroin, fentanyl, methamphetamine, cocaine, and/or other controlled substances in violation of 21 U.S.C. § 846; possession with intent to distribute the same in violation of 21 U.S.C. § 841(a)(1).

9.      For all the reasons articulated below, I have probable cause to believe that evidence

related to these crimes will be located within the following locations, which are more fully described in **Attachments A1 through A6** (attached hereto and incorporated herein by reference):

    a.  10163 Wayne Avenue, Cincinnati, Ohio 45215 (hereinafter **SUBJECT PREMISE A1**). I believe Jason BRADFORD, Roderick SMITH, and others are using SUBJECT PREMISE A1 to sell drugs and as a drug storage location. I believe evidence of BRADFORD and SMITH's drug trafficking will be found at **SUBJECT PREMISE A1**.

    b.  10167 Wayne Avenue, Cincinnati, Ohio 45215 (hereinafter **SUBJECT PREMISE A2**). I believe Jason BRADFORD is using **SUBJECT PREMISE A2** to store illegal drugs and drug proceeds. I believe evidence of BRADFORD's drug trafficking will be found at **SUBJECT PREMISE A2**.

    c.  122 S. Wayne Avenue, Floor 2, Apartment B, Cincinnati, Ohio 45215 (hereinafter **SUBJECT PRESMISE A3**). I believe BRADFORD is using **SUBJECT PREMISE A3** as his primary residence. I believe evidence of BRADFORD's drug trafficking will be found at **SUBJECT PREMISE A3**.

    d.  9660 Colerain Avenue, Storage Unit #455, Cincinnati, Ohio 45251 (hereinafter **SUBJECT PREMISE A4**). I believe Roderick SMITH is using **SUBJECT PREMISE A4** as a storage location for illegal drugs and drug proceeds. I believe evidence of SMITH's drug trafficking will be found at **SUBJECT PREMISE A4**.

    e.  482 Pedretti Avenue, Apartment #10, Cincinnati, Ohio 45238 (hereinafter **SUBJECT PREMISE A5**). I believe SMITH is using **SUBJECT PREMISE A5** as his primary residence. I believe evidence of SMITH's drug trafficking will be found at **SUBJECT PREMISE A5**.

    f.  A 2019 Hyundai Tucson, gray in color, bearing Ohio tags JIY7917, VIN # KM8J2CA43KU943637 (hereinafter **SUBJECT VEHICLE 1**). I believe BRADFORD is using SUBJECT VEHICLE 1 to facilitate his drug trafficking activities. I believe evidence of BRADFORD's drug trafficking will be found in **SUBJECT VEHICLE 1**.

## PROBABLE CAUSE

10. The following statement of facts and circumstances detail the involvement of certain individuals in drug trafficking and the use of the **SUBJECT PREMISES** to facilitate those drug trafficking activities. Based on my training and experience, my participation in this investigation as well as information I believe to be reliable based on oral and written reports about this investigation and other investigations, physical surveillance conducted by federal and/state

4

law enforcement agencies, telephone toll records and subscriber information, location data obtained from GPS tracking devices, public records, and law enforcement databases, I know the following:

### A. Investigation Overview: Jason BRADFORD and Roderick SMITH distribute fentanyl in Cincinnati, Ohio

11.    In July 2021, the Cincinnati FBI and the Hamilton County Sheriff's Office Regional Narcotics Unit (RENU) began an investigation into a large-scale narcotics dealer named Jason BRADFORD, a/k/a "JBrad." BRADFORD is allegedly the leader of a Drug Trafficking Organization (hereinafter BRADFORD DTO) based in the Southern District of Ohio that distributes fentanyl and other narcotics in the Cincinnati, Ohio area. Investigators have learned through interviews, surveillance, phone records, and multiple sources of information that the BRADFORD DTO is closely related to and works with the STEFFEN ROBERSON a/k/a "Worm" and the ROBERSON DTO. The Drug Enforcement Administration (DEA), Cincinnati Police Department (CPD), FBI, and RENU are also investigating the ROBERSON DTO.

12.    A Cooperating Defendant[1] (CD-1) provided information to investigators about the BRADFORD DTO. CD-1 told investigators that BRADFORD is a multi-kilogram level drug trafficker who works closely with Roderick SMITH a/k/a "Pink" and Demetrius RUFF a/k/a "Meaty" to obtain and distribute drugs in the Cincinnati, Ohio area. CD-1 advised that BRADFORD has a Mexican based source of supply in California and has recently traveled to California to pay the source of supply.

13.    CD-1 told investigators that BRADFORD drives a gray Hyundai SUV bearing

---

[1] CD-1 is current charged with violation so of ███████████████████ and is cooperating with law enforcement in the hopes s/he will receive a lower sentence. CD-1 has previously been convicted of ████ ████████████████████ To date, further investigation has corroborated much of the information provided by CD-1 and has not shown any material information provided by CD-1 to be incorrect. Therefore, I consider information provided by CD-1 to be reliable.

Ohio license plate JIY-7917 and was using cell phone number 513-581-7749. Further, BRADFORD used **SUBJECT PREMISE A1** to meet drug customers, store drugs, and store drug proceeds and used **SUBJECT PREMISE A2** to store drugs. CD-1 said that a young female associated with BRADFORD lived at **SUBJECT PREMISE A2**. Through surveillance investigation, investigators were able to confirm this information and identify the female living in **SUBJECT PREMISE A2**. CD-1 identified SMITH's current phone number as 314-516-3256 and previous number as 513-809-3164. The information CD-1 provided to law enforcement has been corroborated by independent investigation in this case.

14.     RENU intelligence inquires revealed that two sources of information previously identified BRADFORD as a drug trafficker. One source of information stated that BRADFORD travels to multiple states, including Arizona and West Virginia, to acquire drugs that are shipped back to Cincinnati. A second source of information said that BRADFORD sells larges amounts of drugs and flies under the radar.

15.     In August 2021, investigators reviewed toll records for BRADFORD and SMITH's cell phone numbers. There were numerous calls between BRADFORD and SMITH and other members of the ROBERSON DTO.

16.     Hamilton County Auditor records show that Kevin BENDFORD Sr. a/k/a "Buck" owns **SUBJECT PREMISE A1**. BENFORD has previously been convicted of drug trafficking and firearms offenses. RENU agents investigated BENFORD in May 2021 for his involvement with a Mexican-based DTO. Agents saw BENFORD meet with Jose Abel Flores GONZALEZ and Saul Eric ANDRADE in the parking lot of Rinks Plaza located at 9651 Hamilton Avenue, Cincinnati, Ohio. Later that day RENU agents seized approximately $288,000 in United States Currency from Jose Abel Flores GONZALEZ and Saul Eric ANDRADE.

17.     On or about August 22, 2021, CD-1 told investigators that BRADFORD and SMITH recently received a delivery of drugs and planned to travel north to deliver the payment. Investigators reviewed court authorized GPS location information for BRADFORD and SMITH's cell phones. At approximately 9:30 p.m. on August 22, 2021, BRADFORD and SMITH's cell phone location began to travel north from Cincinnati, Ohio. At approximately 10:25 p.m., both devices arrived in the greater Dayton area. At 10:50 p.m., both devices began traveling south towards Cincinnati. Based on my training and experience, I know that meetings to deliver payment for drug deliveries are often short in duration and the receiver will count the money to ensure payment is correct. I believe that BRADFORD and SMITH's short stay in the Dayton area is consistent with a meeting to deliver payment and/or drugs.

**B.  Probable Cause for SUBJECT PREMISES A1 and A2**

18.     On August 18, 2021, investigators conducted physical surveillance at **SUBJECT PREMISE A1** and **SUBJECT PREMISE A2**, which are adjacent residences. At approximately 3:15 p.m., agents saw a gray sedan with Kentucky registration tag 470DJS pull into the driveway of **SUBJECT PREMISE A1**. RUFF exited the passenger seat of the car and went to the front porch of **SUBJECT PREMISE A1**. At approximately 3:27 p.m., a gray Hyundai with Ohio license plate JIY7917 (hereinafter **SUBJECT VEHICLE 1**) parked between **SUBJECT PREMISES A1** and **A2**. Agents saw BRADFORD exit **SUBJECT VEHILCE 1** and approach a Chevrolet Malibu registered to Enterprise Rentals (hereinafter SMITH Vehicle 1) that just arrived and was driven by SMITH. SMITH spoke to BRADFORD for a short time and then SMITH departed the area. Surveillance was then discontinued.

19.     On August 30, 2021, agents conducted physical surveillance at **SUBJECT PREMISE A1** and **SUBJECT PREMISE A2**. Agents saw SMITH Vehicle 1 arrive on Wayne

7

Avenue and back into the driveway at **SUBJECT PREMISE A1**. SMITH exited his vehicle and entered **SUBJECT PREMISE A1**. After entering, SMITH entered and exited **SUBJECT PREMISE A1** multiple times gathering unknown items from his trunk. Shortly thereafter, agents saw **SUBJECT VEHICLE 1** arrive and pull in the driveway at **SUBJECT PREMISE A1**. BRADFORD exited **SUBJECT VEHICLE 1** and entered **SUBJECT PREMISE A1**. During surveillance, agents saw multiple vehicles coming and going from **SUBJECT PREMISES A1** and **A2**. BRADFORD was observed entering and exiting **SUBJECT PREMISE A1**.

20. During this same time period, at the direction of law enforcement, CD-1 made a recorded phone call to SMITH and SMITH agreed to sell CD-1 an amount of fentanyl.[2] During the phone call, SMITH's phone location information showed SMITH was in the area of **SUBJECT PREMISE A5**. SMITH agreed to sell CD-1 an amount of fentanyl in exchange for U.S. Currency. Agents surveilling **SUBJECT PREMISE A5** saw SMITH's car parked in a lot between **SUBJECT PREMISE A5** and 480 Pedretti Avenue. Agents saw SMITH leave the area near **SUBJECT PREMISE A5** in SMITH Vehicle 1. Later, SMITH arrived at and entered **SUBJECT PREMISE A1**. BRADFORD's phone location information showed him in the area of **SUBJECT PREMISE A1** at this time. BRADFORD's vehicle was also located at **SUBJECT PREMISE A1**. After a short time, SMITH left **SUBJECT PREMISE A1** and traveled to the pre-determined meeting location to meet CD-1 for the drug sale. SMITH sold CD-1 the fentanyl in exchange for an amount of pre-recorded U.S. Currency. The drugs SMITH sold to CD-1 tested positive at the lab for acetyl fentanyl, benzyl fentanyl, fentanyl, and cocaine.

21. On September 10, 2021, a RENU agent established surveillance at **SUBJECT**

---

[2] The specific dates, dollar amounts and quantities of narcotics purchased are identified in a limited range to protect the identity of the confidential informants and to prevent members of the BRADFORD DTO from identifying the informants and conducting acts of violence and intimidation.

**PREMISES A1** and **A2** to conduct a trash pull at the locations. During the early morning hours, the agent collected four white trash bags from **SUBJECT PREMISE A1** and six black trash bags from **SUBJECT PREMISE A2**. The agent transported the trash to a secure location for examination. In the trash examined from **SUBJECT PREMISE A1**, the RENU agent found several plastic sandwich baggies with white powdery residue inside. I know, based on my training and experience, that drug traffickers commonly use plastic sandwich bags to package drugs for resale. The residue on the recovered plastic baggies tested positive as cocaine and ANPP, a precursor to fentanyl. In the trash examined from **SUBJECT PREMISE A2**, the agent recovered one rubber glove, additional plastic sandwich baggies, Springdale dry cleaning receipts with the name "J. BRADFORD" and phone number 581-7749, mail addressed to ████████████ at 10167 Wayne Avenue, and receipts from Barstool Sportsbook at Hollywood Casino (a known hangout for BRADFORD). The plastic bags and rubber glove field tested negative for controlled substances.

22. On September 10, 2021, investigators learned from the absence of phone location information that SMITH had turned off his cell phone and switched phone numbers. Based on my training and experience, I know that drug traffickers frequently change phone numbers to evade law enforcement detection. Law enforcement identified SMITH's new phone number and obtained a search warrant for phone location information for the new number.

23. On September 13, 2021 at 8:38 p.m., location information from the tracker on **SUBJECT VEHICLE 1** showed the vehicle was in the area of the CVG airport in Hebron, Kentucky for a short duration. A few hours later, SMITH's phone location information showed SMITH in Los Angeles, California. The next day, SMITH's phone location information was back in Cincinnati, Ohio. Based on my training and experience, I know that drug traffickers travel out

9

of state to meet with suppliers and arrange drug deals. I further believe, based on location information from **SUBJECT VEHICLE 1** that BRADFORD dropped SMITH off at the airport to travel to Los Angeles and arrange a drug deal.

24. On September 20, 2021, BRADFORD's phone location information and location information from a tracker on **SUBJECT VEHICLE 1** showed BRADFORD traveling south on Cincinnati on Interstate 71. At approximately 4:34 p.m., surveillance units saw BRADFORD and a female, believed to be ▮▮▮▮▮▮▮ leave **SUBJECT PREMISE A2** and get into **SUBJECT VEHICLE 1**. At approximately 6:14 p.m., location information for BRADFORD's phone and **SUBJECT VEHICLE 1** arrived in the area of Springhill Drive, Lexington Kentucky. At approximately 6:46 p.m., **SUBJECT VEHICLE 1** departed Springhill Drive and traveled back to Cincinnati, Ohio. At 8:25 p.m., BRADFORD and the female believed to be ▮▮▮▮▮▮ arrived at **SUBJECT PREMISE A2** and entered the front door. Based on my training and experience, I know that large-scale drug traffickers frequently meet suppliers and customers out of state, and I believe BRADFORD's travel to Lexington, Kentucky is consistent with drug trafficking activities.

25. On September 21, 2021 at approximately 1:20 p.m., surveillance at **SUBJECT PREMISES A1** and **A2** showed SMITH outside of **SUBJECT PRESMISE A1** standing next to SMITH Vehicle 1. ▮▮▮▮▮▮▮ walked out of **SUBJECT PREMISE A2** and SMITH went to the front porch and spoke to ▮▮▮▮▮▮▮▮▮▮ walked back inside **SUBJECT PRESMISE A2** and SMITH walked back towards his car, pacing. Three minutes later, ▮▮▮▮▮▮▮ exited **SUBJECT PREMISE A2** and handed SMITH an unknown item, which appeared to be a light-colored bag. Shortly thereafter, an unknown male arrived at **SUBJECT PREMISE A1** and parked in the driveway. The unknown male got into SMITH's vehicle and

SMITH drove away. A short time later, SMITH Vehicle 1 returned to **SUBJECT PREMISE A1**, the unknown male exited SMITH's vehicle and both left in their respective vehicles. Based on my training and experience, and my investigation in this case, I believe that SMITH met ███████████ to obtain drugs to sell to the unknown male and that drugs are also stored at **SUBJECT PREMISE A2.**

26.     On October 5, 2021 at approximately 1:30 p.m., investigators saw a dark Chevrolet sedan pull into the driveway of **SUBJECT PREMISE A2**. BRADFORD and RUFF were standing outside of **SUBJECT PREMISE A1** near **SUBJECT VEHICLE 1** when the sedan pulled in. An unidentified male exited the sedan and walked over to BRADFORD and had a short conversation with BRADFORD and RUFF. BRADFORD opened the door to **SUBJECT VEHICLE 1** and sat down. The unidentified male walked to **SUBJECT VEHICLE 1** and leaned over in a manner concealing his hands. At approximately 1:54 p.m., the unidentified male left the area. Throughout that day, multiple individuals arrived at **SUBJECT PREMISE A1** and stayed for a short period of time. SMITH went to **SUBJECT PREMISE A1** two times that day, one visit from approximately 3:00 p.m. to 3:16 p.m., and the second from approximately 5:00 p.m. to 5:08 p.m.

27.     In the early morning hours of October 8, 2021, investigators saw **SUBJECT VEHICLE 1** in the area of 3920 Old Ludlow Avenue. BRADFORD's phone location information place him in the same location. Investigators initiated physical surveillance at 3920 Old Ludlow and saw **SUBJECT VEHILCE 1**, a vehicle associated with Steffen ROBERSON, a vehicle associated with ████████████ and a vehicle associated with ████████████ I saw several individuals inside 3920 Old Ludlow. ROBERSON, ███████ and ███████ are well-known, large-scale drug traffickers, gamblers, and money launderers in the greater Cincinnati area.

28.     Later on October 8, 2021, location information showed BRADFORD's phone traveling south in Interstate 75. Location information showed BRADFORD's phone traveled from the Cincinnati area south on Interstate 75 to Atlanta, Georgia and arrived in Atlanta at approximately 4:20 p.m. Agents saw RUFF arriving at **SUBJECT PREMISE 1** driving **SUBJECT VEHICLE 1**, which BRADFORD usually operated. Shortly after arriving in Atlanta, BRADFORD's phone turned off. Based on my training and experience, I am aware that drug traffickers will sometimes turn off their cell phones while engaged in illegal activities, such as transporting and trafficking in drugs. At approximately 11:05 p.m., agents observed, who they believed to be BRADFORD arrive at **SUBJECT PREMISE 1** in a van. Based on my training and experience, and my participation in this investigation, I believe BRADFORD traveled to Atlanta to transport U.S. Currency to Atlanta or to transport drugs from Atlanta to Cincinnati.

29.     On October 15, 2021, RENU agents established surveillance at **SUBJECT PREMISES A1** and **A2** to conduct a trash pull at the premises. Agents recovered seven white plastic bags from **SUBJECT PREMISE A1** and four black plastic bags from **SUBJECT PREMISE A2**, which were transported to a secure location for examination. During examination of the trash discarded from **SUBJECT PREMISE A1**, agents found several plastic sandwich baggies, large clear plastic bags, and plastic gloves, consistent with drug trafficking. The sandwich baggies and gloves had a white residue, which field tested positive for 4-ANPP (fentanyl precursor) and fentanyl. In addition, mail addressed to "the Ruff Residence" was found. Nothing of evidentiary value was found in the trash recovered from **SUBJECT PREMISE A2**.

30.     On October 22, 24, and 25, 2021, investigators saw SMITH at **SUBJECT PREMISE A1**. On all occasions, SMITH was driving a white GMC Terrain with California license plate 8UHA035, registered to Enterprise Rentals. On October 25, 2021, BRADFORD got

into SMITH's vehicle at **SUBJECT PREMISE A1** and the two left together. After October 25, 2021, SMITH again switched vehicles. Based on my training and experience, I know that drug traffickers frequently change vehicles to evade law enforcement detection.

31. On two occasions, August 22, 2021 and October 21, 2021, BRADFORD traveled to the vicinity of Springfield, Ohio and returned to the area **SUBJECT PREMISE A1**. CD-1 told law enforcement that after BRADFORD's second trip, BRADFORD was FaceTime calling people while in possession of five kilograms of some type of narcotics. CD-1 also said that SMITH FaceTime called individuals showing a kilogram of some type of narcotics inside **SUBJECT PREMISE A1**.

32. Tracker location information showed **SUBJECT VEHILCE 1** was parked at the CVG airport garage in Hebron, Kentucky from on or about October 28, 2021 until November 2, 2021. At approximately 10:09 p.m. on November 2, 2021, the vehicle left the airport and traveled to **SUBJECT PREMISE A5**. After a brief stop at **SUBJECT PREMISE A5**, **SUBJECT VEHICLE 1** traveled to the area of **SUBJECT PREMISES A1** and **A2**. At 2:13 a.m. on November 2, 2021, the **SUBJECT VEHICLE 1** left the vicinity of **SUBJECT PREMISES A1** and **A2** and traveled to **SUBJECT PREMISE A3**.

33. In response to an administrative subpoena, investigators received records from Duke Energy for **SUBJECT PREMISES A1** and **A2**. RUFF is the utility account holder for **SUBJECT PREMISE A1**. RUFF has prior convictions for drug trafficking and agents have seen RUFF with BRADFORD and SMITH on several occasions. ███████████ is the utility account holder for **SUBJECT PREMISE A2** and provided Duke Energy with phone number 513-886-1733. Toll records for BRADFORD's phone show that the 1733 phone number has frequent calls with BRADFORD's cell phone.

### C. Probable Cause for SUJBECT PREMISE A3

34.     On September 9, 2021, investigators established surveillance at **SUBJECT PREMISE A3**.  Investigators saw **SUBJECT VEHILCE 1** parked near **SUBJECT PRESMISE A3** and observed BRADFORD exiting **SUBJECT PREMISE A3** and enter **SUBJECT VEHICLE 1**.

35.     On September 14, 2021, agents established surveillance near **SUBJECT PREMISE A3** and saw **SUBJECT VEHICLE 1** park in the vicinity.  Location information for BRADFORD's phone also placed the phone in the area of **SUBJECT PREMISE A3**.  At approximately 11:46 a.m., an agent saw BRADFORD exit the side door of the apartment building at 122 South Wayne Avenue.  BRADFORD walked to **SUBJECT VEHICLE 1** and left the area. Additional location information from BRADFORD's phone shows that BRADFORD spends a significant amount of time in the area of **SUBJECT PREMISE A3**, including several overnight stays per week.

36.     Through additional information, investigators determined that BRADFORD stayed in Apartment B on the second floor at **SUBJECT PREMISE A3**. On September 17, 2021, investigators received Duke Energy records for 122 South Wayne Street, which is a dual use building with retail on the first floor and two apartments (A and B) on the second floor.  Apartment B had Duke utilities registered to ▮▮▮▮▮▮▮▮▮▮  Duke Energy records listed ▮▮▮▮▮▮▮ telephone number as 513-720-4606.  A review of phone records for BRADFORD's phone showed multiple contacts between ▮▮▮▮▮ and BRADFORD.  ▮▮▮▮▮▮ has previously been convicted of drug trafficking, drug possession, and involuntary manslaughter.  He is currently wanted for a probation violation.  Duke Energy records showed that Apartment A's utilities were in the owner and landlord of the building.  Agents have not identified any information connecting BRADFORD

14

and the landlord during their investigation.

37.     I believe that BRADFORD is primarily living in Apartment B, which is **SUBJECT PREMISE A3**. My belief is based physical surveillance of BRADFORD coming to and from the premise, BRADFORD's phone and vehicle location information placing BRADFORD near the premise frequently, including multiple overnight visits per seek, and BRADFORD's connection to ▮▮▮▮▮▮▮▮ Based on my training and experience, I am aware that drug traffickers often store drug proceeds, controlled substances, telephones, and other instrumentalities at their residences. Therefore, I believe that **SUBJECT PREMISE A3** will contain evidence of BRADFORD's drug trafficking.

### D.  Probable Cause for SUBJECT PREMISES A4

38.     Agents interviewed a confidential source (CHS-1[3]) in or around late October 2021. CHS-1 told agents that SMITH sells kilograms of narcotics and uses storage units to store drugs. In February 2020, law enforcement searched SMITH's storage unit located at Public Storage, 9660 Colerain Avenue, Unit #455 Cincinnati, Ohio, (**SUBJECT PREMISE A4**) as part of the ongoing investigation into the ROBERSON DTO and SMITH. During that timeframe, SMITH was both physically and electronically surveilled going to the storage unit on numerous occasions and was observed carrying items to and from the unit.  The search warrant executed in February 2020 revealed personal items belonging to SMITH inside the storage unit, but no narcotics or contraband were found on that date.

39.     On November 1, 2021, investigators contacted the management at Public Storage,

---

[3] CHS-1 is currently charged with the following offenses: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ CHS-1 has previously been convicted of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ To date, investigation has corroborated much of the information provided by CHS-1 and has not shown any material information provided by CHS-1 to be incorrect.  Therefore, I consider CHS-1 to be reliable.

9660 Colerain Avenue, who told agents that SMITH rented Unit 455. A review of GPS tracker information installed on SMITH's rental vehicles showed that SMITH has made frequent stops at **SUBJECT PREMISE A4**. SMITH Vehicle 1 stopped at **SUBJECT PREMISE A4** eight times in September 2021 and each stop was short in duration, consistent with drug trafficking. GPS data from SMITH's GMC Terrain rental vehicle showed that SMITH stopped at **SUBJECT PREMISE A4** on October 26, 2021.

40.     Based on my training and experience, I am aware that drug traffickers use storage units as stash locations for bulk amounts of illegal drugs and U.S. Currency, sometimes on a temporary basis to hide other illegal activity from law enforcement. Therefore, I believe **SUBJECT PREMISE A4** will contain evidence of SMITH's criminal activity.

### E.  Probable cause for SUBJECT PREMISE A5

41.     During my investigation, CD-1 advised agents that SMITH was living with his girlfriend at an apartment inside 482 Pedretti Avenue. CD-1 also said that SMITH and his girlfriend previously lived at 487 Pedretti Avenue. Agents identified SMITH's girlfriend as ▮▮▮▮▮▮▮▮ who lists 487 Pedretti as her address. 487 Pedretti is located directly across the street from **SUBJECT PREMISE A5.**

42.     Investigators have seen SMITH frequenting 482 Pedretti several times a day and typically during the overnight hours. SMITH Vehicle 1 was frequently parked in the building's parking lot in spot "10." Parking spot 10 is assigned to Apartment 10. As explained in Paragraph 21, SMITH traveled from 482 Pedretti Avenue to **SUBJECT PREMISE A1** before selling CD-1 fentanyl.

43.     In response to an administrative subpoena, investigators received records associated with Apartment 10 (**SUBJECT PREMISE A5**) from Duke Energy. Duke Energy

16

records show the utility account holder for **SUBJECT PREMISE A5** is ███████ with a listed social security number of XXX-XX-1288 and cell phone number 513-657-9342. A check of law enforcement databases and public source databases revealed minimal history for ███████ No driver's license records were found. A check of the Clear public source database flagged ███████ social security number as "not issued." The limited history associated with ███████ listed 487 Pedretti Avenue, Cincinnati, Ohio as a previous address. Subpoenaed records from Duke Energy regarding 487 Pedretti Avenue revealed the account holder as ███████ ███████ who is the mother of ███████ The cell phone number provided by Duke for ███████ 513-657-9342, is registered to a person I believe to be the father of Girlfriend 1. A review of ███████ publicly available Instagram page which is missshells4 revealed a photograph of her son, which appears to be taken outside 482 Pedretti Avenue. The brick color and distinctive white shutters captured in that photo match the brick and shutters on building 482 Pedretti.

44. On November 11, 2021, a BMW bearing Ohio plates JGV9674, registered to ███████ ███████ was observed parked outside 487 Pedretti Avenue. Law Enforcement conducting surveillance on the various rental vehicles drive by SMTH have observed those vehicles on multiple occasions parked outside 487 Pedretti Avenue. Additionally, a black Toyota Avalon with Ohio plates JCF2068, registered to ███████ ███████ has been observed by law enforcement being parked in the spot marked "10" at **SUBJECT PREMISE A5**.

45. Investigation into ███████ ███████ reveled involvement in a previous FBI investigation into the REED DTO. A Cincinnati Police Department source advised that ███████ ███████ was a courier for the REED DTO and would assist the DTO by transporting cash and narcotics from Cincinnati to Chicago. ███████ was not charged in that investigation. A review of Duke Energy records from 487 Pedretti Avenue revealed that ███████ ███████ was the account

holder for Floor 1 and Floor 2. Based on my training and experience, and my participation in this investigation, I believe SMITH and ███████████ live at **SUBJECT PREMISE A5**.

46.     Based on my training and experience, I believe SMITH, █████████ and ████████████ created the fictious ████████ identity to further their drug trafficking activities. In recent FBI and RENU investigations, fake identifications were used by Cincinnati area DTOs to rent apartments and houses. Through my training and experience, I am aware that drug dealers know about law enforcement techniques and rent apartment and houses in fictious names to separate themselves from being associated with the locations. In my experience, search warrants executed on locations where fictious identifications have been used to rent locations and obtain utilities have yielded significant amounts of drugs, U.S. Currency and firearms. Through my training and experience, I am also aware that drug dealers often store illegal drugs, drug proceeds, and contraband in their residences. Therefore, I believe **SUBJECT PREMISE A5** will contain evidence of SMITH's criminal activity.

47.     Based upon my training and experience, the training and experience of other law enforcement officers and the facts contained herein, I know materials searched for and recovered in locations involved in drug investigations have included various controlled substances, including, but not limited to: cocaine and fentanyl; drug paraphernalia such as scales, papers and drug packaging materials; books and records reflecting sales, the transfer or transportation of drugs and amounts of monies owed for drugs; records reflecting the names, addresses, and telephone numbers of co-conspirators; sales receipts and other records reflecting the expenditure of monies that are the proceeds from unlawful drug distribution; currency and money wrappers; records of transactions to conceal and launder drug trafficking proceeds; and various valuable assets purchased with the proceeds of unlawful drug trafficking. These items, obtained by search

warrants, constituted evidence of Federal drug violations.

## ITEMS COMMON TO SEARCH AND SEIZURE

48.     Based upon my training and experience, my participation in this investigation, and

other drug trafficking investigations, I have reason to believe that:

a.  drug traffickers often place assets in names other than their own to avoid detection of
    these assets by government and law enforcement agencies;

b.  drug traffickers often place assets in names of business/corporate entities as nominee
    title holders in order to avoid detection of these assets by government and law
    enforcement agencies; even though these assets are placed in the names of other
    persons or entities, the drug traffickers continue to use these assets and exercise
    dominion and control over them;

c.  drug traffickers must maintain and/or have quick access to large amounts of United
    States currency or other liquid assets in order to maintain and finance their ongoing
    drug business;

d.  drug traffickers often maintain money counting machines, money wrappers and rubber
    bands, boxes, bags, brief cases, suitcases, or containers used to carry drug proceeds
    and/or controlled substances;

e.  drug traffickers often maintain in their residences and/or business establishments
    records relating to the transportation, ordering, sale and distribution of controlled
    substances and the outstanding debts and collections from controlled substances that
    have been distributed including some or all of the following written books, records,
    receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other
    papers (i.e. bank account records, wire transfer records, bank statements, safe deposit
    box keys and records, money wrappers, rubber bands, money containers, financial
    records and notes showing payment, receipt, concealment, transfer, or movement of
    money generated from the illegal sale of drugs);

f.  drug traffickers commonly use cellular phones to communicate with other members of
    the DTO, narcotics source of supply(s), and/or narcotics customers in furtherance of
    violations of the Uniform Controlled Substances Act;

g.  drug traffickers commonly provide illegal narcotics to their organization on
    consignment sale to their customers, who subsequently pay for the drugs after reselling
    said drugs. Therefore, the above-mentioned books, records, receipts, notes, ledgers,
    etc., will be secured by the drug traffickers within their residences and/or their
    businesses for their ready access for the purpose of determining drug debts and
    collecting monies derived from the sale of drugs;

h.   drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of drug associates within their residence and/or place of business, their business vehicles, or the curtilage of their residence or business for ready access and to hide them from law enforcement agencies;

i.   drug traffickers commonly will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services (i.e., safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts), and evidence of this includes documents like stock certificates, bonds, deposit certificates, and travelers checks;

j.   drug traffickers often have photographs or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds.   These photographs and video movies are normally in the drug traffickers possession, their residence and/or their place of business;

k.   drug traffickers' methods of transporting drugs include but are not limited to: commercial airlines, private motor vehicles, and government and contract mail carriers. I know that the vehicles, residences, or business locations of drug traffickers will often contain records of drug-related travel. These records may include airline ticket receipts, credit card receipts, traveler vouchers, hotel and restaurant receipts, photographs, canceled checks, maps, and written directions to locations rental car receipts and luggage tags reflecting points of travel;

l.   drug traffickers commonly have firearms in their possession (on their person, at their residence, and/or their business) including but not limited to handguns, rifles, shotguns and automatic weapons.   These firearms are most often used and/or maintained in order to protect and secure a drug trafficker's property or manufacturing operation;

m.   it is common for drug traffickers to secrete in their vehicles items identified in the above paragraphs;

n.   drug traffickers will often accumulate and maintain substantial amounts of drug proceeds, specifically currency, over a period of years, so that the proceeds can be used in later years for personal asset acquisitions and/or expenditures during periods when a drug trafficker is not distributing drugs;

o.   drug traffickers commonly will maintain residence(s) separate from their primary residence to serve as "safe houses" where the traffickers may stay for periods of time; I know that these residences which may be occupied by other conspirators or associates may contain elements of the traffickers drug crimes to include all items noted above;

p.   drug traffickers commonly have evidence of purchases of goods used in the manufacture of controlled substances secreted in their residences, businesses, or vehicles; and

q.   drug traffickers commonly secret in their residences and/or places of business, over a

period of years, items such as those identified in the above paragraphs.

## CONCLUSION

49.     I believe the facts contained within this affidavit support probable cause to believe that BRADFORD, SMITH and others are involved in a conspiracy to possess and distribute controlled substances. Based on my training, experience, discussions with other law enforcement officers/agents, and the information contained herein, I believe that probable causes exists that the items listed in **Attachment B** as evidence, contraband, fruits and instrumentalities of crime, persons to be arrested, property used or intended to be used in the commission of crime(s), related to evidence of a conspiracy to possess with intent to distribute, and distribute cocaine and fentanyl, will be found at the locations identified in **Attachments A1 through A6.**

ANTHONY C. OTT
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on this  15  day of November, 2021.
**via electronic means, specifically Facetime video.**

HONORABLE STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

21

# ATTACHMENT A6

## (SUBJECT VEHICLE 1)

### Property to be searched:

A 2019 Hyundai Tucson, gray in color, bearing Ohio license plate JIY7917 with VIN # KM8J2CA43KU943637



# **ATTACHMENT B**

### **Property to be seized:**

All records relating to violations of 21 U.S.C. §§ 841(a)(1), 846 (distribution of and/or possession with the intent to distribute controlled substances and conspiracy to do the same); possession of firearms in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c) including the following:

a. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity and/or times when drugs were obtained, transferred, sold, distributed, and/or concealed;

b. Bank account records, wire transfer records, bank statements, safe deposit box keys and records, money wrappers, rubber bands, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the illegal sale of drugs;

c. Cellular telephones, digital telephones, car telephones, or other communications devices which evidence participation in a conspiracy to distribute controlled substances.

d. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

e. Any computer equipment, digital device, magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and any other digital device capable of accessing the internet and capable of being used to commit or further the crimes outline above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes.

f. Financial instruments purchased with currency derived from the sale of controlled substances, including travelers' checks, bonds, stock certificates, cashier's checks, and certificates of deposit;

g. Money counting machines, money wrappers and rubber bands, boxes, bags, briefcases, suitcases, or containers used to carry controlled substances;

h. Records, documents, and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

i. Records, items, and documents reflecting travel for the purpose of participating in drug trafficking, including airline tickets, credit card receipts, traveler vouchers, hotel and restaurant receipts, photographs, canceled checks, maps, and written directions to locations;

j. Handguns, shotguns and other firearms, and ammunition, which may be used to facilitate the distribution or possession with intent to distribute controlled substances;

k. Indicia of ownership and use of the vehicles, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, keys and bank account records, registration, title, insurance, and traffic tickets;

l. Photographs or video movies of drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

m. Controlled substances, including, but not limited to, methamphetamine and/or marijuana.

n. Drug paraphernalia, which can be used to store, package, weigh, dilute, and ingest controlled substances; equipment pertaining to methamphetamine and/or marijuana, and any other supplies related to the manufacture and distribution of said controlled substances.

o. United States currency, precious metals, jewelry, financial instruments and stocks and bonds; and

p. Any locked or closed containers, to include safes or lockboxes, believed to contain any of the above listed evidence

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of cell phone or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "cell phone" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop cell phones, notebook cell phones, mobile phones, tablets, server cell phones, and network hardware.

The term "storage medium" includes any physical object upon which cell phone data can be recorded. Examples include hard disks, SIM cards and other magnetic media.